**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JAMES F. SULLIVAN,         )
                       )    CIVIL ACTION NO. 05-1411
        Petitioner,    )
                       )    Judge Thomas M. Hardiman
   v.                )
JAMES WYNDER, <u>et al.</u>,    )    Magistrate Judge
                       )    Amy Reynolds Hay
        Respondents.    )

<u>REPORT AND RECOMMENDATION</u>

I.   <u>RECOMMENDATION</u>

It is recommended that the Petition for Writ of Habeas Corpus be denied and that a certificate of appealability be denied.

II. <u>REPORT</u>

On April 3, 2002, a jury empaneled by the Court of Common Pleas of Fayette County found Petitioner, James F. Sullivan, guilty of first-degree murder in the death of Linda Covach.  The Honorable Conrad B. Capuzzi presided over the trial and sentenced Petitioner to the mandatory term of life imprisonment.

Petitioner, who is presently incarcerated at the State Correctional Institution in Dallas, Pennsylvania, has filed with this court a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Therein, he raises the following claims:

   1.   His trial attorney, David Kaiser, Esquire, provided him with ineffective assistance when counsel:

      (a)   failed to argue that Petitioner's federal constitutional rights were violated due to the Commonwealth's failure to obtain an indictment by

                        a grand jury;

      (b)    stipulated to the chain of custody of DNA
              evidence;

      (c)    failed to conduct DNA testing on a black hair
              found on the victim;

      (d)    failed to call Charles Martin and Patrick Malamphy
              to testify for the defense;

      (e)    failed to request that the prosecuting attorney be
              removed from the case due to an alleged conflict
              of interest;

      (f)    failed to investigate and procure the removal of
              Juror No. 241, who allegedly had communicated with
              the victim's family during the trial proceedings;
              and,

      (g)    failed to object to the purported "highly
              prejudicial" portions of Mary Matlock's testimony
              in which she discussed his "prior bad acts."

2.    His appellate counsel, Dianne H. Zerega, Esquire,
     provided him with ineffective assistance for failing to
     argue on direct appeal that the prosecution violated
     his constitutional rights when it:

      (a)    knowingly introduced the perjured testimony of
              Clarence LaRue; and,

      (b)    failed to conduct DNA testing on the black hair
              found on the victim's body.

(Doc. 1 at 3).

## A.   Relevant Factual and Procedural History

On November 2, 1978, Linda Covach's body was found in a
wooded area in South Union Township, Fayette County,
Pennsylvania.  She suffered twenty-four lacerations and three
fractures to her head, blunt force injuries to her body, and a
large skull fracture.  No murder weapon was recovered.  Cyril H.

Wecht, M.D., determined that she was killed the evening of
October 31, 1978.

Covach's homicide remained unsolved for more than twenty
years.  In or around 2000, Petitioner's DNA profile became
available through the offender index maintained by the FBI
Laboratory's Combined DNA Index System ("CODIS").  Through CODIS,
Petitioner's DNA was matched to DNA recovered in 1978 from semen
that had been obtained with a vaginal swab during the autopsy of
Covach.  As a result of the DNA link, the Commonwealth charged
Petitioner with criminal homicide on December 14, 2000.

Attorney Kaiser represented Petitioner during pre-trial and
trial proceedings.  The Superior Court of Pennsylvania provided a
detailed summary of the evidence admitted at Petitioner's trial
in its February 19, 2003 Opinion.  (See Doc. 21, Ex. 3 at 117-
27).  To briefly summarize, the Commonwealth presented evidence
to established that Petitioner had admitted that he killed
Covach.  Mary Matlock, who was living with Petitioner at the time
of the murder, testified that he told her that he had a date with
the victim on October 31, 1978, and that they argued when she
told him that she was pregnant by another man.  Petitioner told
Matlock that he slapped the victim and struck her with a pipe.
He dragged her to some bushes and hit her again because she was
still alive.  He admitted to Matlock that he had intercourse with
the victim the night of her murder, and that he threw the pipe he

3

used to beat her into a river, along with his clothing.

Matock also testified that Petitioner was not at home the night of the crime.  When he did come home at 6:30 a.m. the next morning, he was wearing different clothes from that which he had left home in, he had blood on his face, and mud and blood on his jeans.  He took a bath, and when she opened the door to check on him she saw him flushing his necklace and watch down the toilet. Later that afternoon, she observed him wiping down the doors of his black 1976 Oldsmobile Cutlass.  Matlock testified that Petitioner set that same car on fire in 1979.

The Commonwealth also presented evidence that, in addition to confessing to Matlock, Petitioner also confessed to Clarence LaRue.  LaRue testified that in 1980 Petitioner told him that he had done a "big caper" and that he had "beat the cops."  LaRue stated that Petitioner told him that he was dating a woman from the R Lounge (an establishment Covach frequented) and that he beat her and dumped her body at the edge of the woods.

In addition to his confessions, the Commonwealth also presented the DNA evidence to establish that Petitioner was in the victim's company around the time that the murder occurred. An employee of the Pennsylvania State Police Regional DNA Crime Lab testified that the DNA found in the semen recovered from the victim matched Petitioner's DNA.  She explained that the odds that the semen came from a Caucasian other than Petitioner were

4

approximately 1 in 37 trillion.  Dr. Wecht, who conducted the
autopsy, testified that the victim and Petitioner had engaged in
sexual intercourse within 48 to 72 hours prior to the autopsy.
The autopsy was conducted on November 3, 1978.

Petitioner did not present any witnesses in his defense.
During closing argument, Attorney Kaiser attacked the credibility
of the Commonwealth's witnesses and argued that the only new
evidence against Petitioner that was not known many years ago was
the DNA evidence linking Petitioner's semen to that which was
found on the vaginal swab.  Counsel emphasized that the fact that
Petitioner had sexual relations with the victim at some point
around the time of her murder did not mean that he killed her.

The jury convicted Petitioner of first-degree murder and
Judge Capuzzi sentenced him to the mandatory term of life
imprisonment.  Petitioner, through new court-appointed counsel,
Dianne H. Zerega, Esquire, appealed his judgment of sentence.  On
February 19, 2003, the Superior Court of Pennsylvania affirmed.
(Doc. 21, Ex. 3 at 117-27).  Petitioner did not appeal that
decision to the Supreme Court of Pennsylvania.

Petitioner filed a timely *pro se* post-conviction motion
pursuant to the Pennsylvania Post-Conviction Relief Act ("PCRA").
In September 2003, Judge Capuzzi appointed Jeffrey S. Proden,
Esquire, to represent him.  Judge Capuzzi granted Petitioner's
request for an evidentiary hearing, which was conducted on

October 17, 2003.  (Doc. 21, Ex. 3 at 1-99).

After conducting the evidentiary hearing, Judge Capuzzi denied the PCRA petition.  (Doc. 21, Ex. 3 at 301-07).  Petitioner appealed.  On August 13, 2004, the Superior Court affirmed.  (Doc. 21, Ex. 3 at 128-41).  Petitioner then filed with this court a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  (Doc. 1).

**B.** **Legal Analysis**

**(1)** **Standard of Review**

The Superior Court adjudicated all but one of Petitioner's ineffective assistance of counsel claims on the merits.  Accordingly, this court must review those claims that were adjudicated on the merits under the deferential standard set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") (codified at 28 U.S.C. § 2254(d)).  AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002).

Under AEDPA, federal habeas relief may only be granted when the state court's decision on the merits of a claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by

the Supreme Court of the United States[.]" 28 U.S.C.
§ 2254(d)(1); see also Williams v. Taylor, 529 U.S. 362, 405-06
(2000); Lambert v. Blackwell, 387 F.3d 210, 234 (3d Cir. 2004).
This determination requires a two-step analysis. See e.g.,
Hackett v. Price, 381 F.3d 281, 287 (3d Cir. 2004); Werts v.
Vaughn, 228 F.3d 178, 197 (3d Cir. 2000).  First, the court must
identify the applicable Supreme Court precedent and determine
whether the state court's adjudication of the claim is "contrary
to" it.[1]  Id.  If it is not, then the court must determine
whether the state court's adjudication was an "unreasonable
application" of that law.[2]  Id.

    The "clearly established Federal law" in which to analyze
Petitioner's claims of ineffective assistance of trial and
appellate counsel is set forth in Strickland v. Washington, 466
U.S. 668 (1984).  In Strickland, the Supreme Court held that in
order to establish that counsel's service was constitutionally

---

    [1] "A state-court decision is 'contrary to' clearly established
federal law if the state court (1) 'contradicts the governing law set
forth in [the Supreme] Court's cases' or (2) 'confronts a set of facts
that are materially indistinguishable from a decision of [the Supreme]
Court and nevertheless arrives at a [different] result.'"  Lambert,
387 F.3d at 234 (quoting Williams, 529 U.S. at 405-06).

    [2] "A state-court decision 'involve[s] an unreasonable
application' of clearly established federal law if the state court (1)
'identifies the correct governing legal rule from [the Supreme]
Court's cases but unreasonably applies it to the facts of the
particular . . . case'; or (2) 'unreasonably extends a legal principle
from [Supreme Court] precedent to a new context where it should not
apply or unreasonably refuses to extend that principle to a new
context where it should apply.'"  Lambert, 387 F.3d at 234 (quoting
Williams, 529 U.S. at 407).

deficient, a petitioner must demonstrate: (1) that counsel's performance was unreasonable;[3] and (2) that the deficient performance prejudiced the defense.[4]  <u>See</u> <u>also</u> <u>Wiggins v. Smith</u>, 539 U.S. 510, 521 (2003).

### (2)   The Superior Court's Decision Was Not "Contrary To" Strickland

The Superior Court's adjudication of Petitioner's ineffective assistance of counsel claims was not "contrary to" <u>Strickland</u>.  The Superior Court applied the correct legal standard to the claims, and that is sufficient to satisfy review under the "contrary to" clause of § 2254(d)(1).[5]  As the <u>Williams</u>

---

[3]  To meet the first requirement of <u>Strickland</u>, the petitioner must establish that his attorney's representation fell below an objective standard of reasonableness by committing errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.  466 U.S. at 688.  A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the petitioner must overcome the presumption that, under the totality of the circumstances, the challenged action "might be considered sound trial strategy." <u>Id.</u> at 689, 690-92.  The question is not whether the defense was free from errors of judgment, but whether counsel exercised the customary skill and knowledge that normally prevailed at the time and place.  <u>Id.</u> at 689.  Obviously, when a petitioner claims that his counsel failed to raise a claim that the court determines to be meritless, habeas relief under <u>Strickland</u> is not available.  <u>See</u> <u>id.</u> at 691 (the failure to pursue "fruitless" claims "may not be challenged as unreasonable.")

[4]  To prove prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694.

[5]  Although in its August 13, 2004 Opinion denying Petitioner PCRA relief the Superior Court articulate a three-prong test for gauging ineffective assistance claims and <u>Strickland</u> sets forth its test in two prongs, the legal evaluation is the same, and the

Court instructed, "a run-of-the mill state-court decision applying the correct legal rule from [Supreme Court] cases [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." 529 U.S. at 406; <u>Rompilla</u>, 355 F.3d at 202-24 ("[A] state court decision that applied the Pennsylvania [ineffective assistance of counsel] test did not apply a rule of law that contradicted <u>Strickland</u> and thus was not 'contrary to' established Supreme Court precedent.")

### (3)   The Superior Court's Decision Was Not an "Unreasonable Application Of" <u>Strickland</u>

The dispositive question, then, is whether the Superior Court's adjudication of any of Petitioner's ineffective assistance of counsel claims was an "unreasonable application" of <u>Strickland</u>. In making this determination, "we are not authorized to grant habeas corpus relief simply because we disagree with the state court's decision or because we would have reached a

---

differences merely reflect a stylistic choice on the part of state courts.  <u>Rompilla v. Horn</u>, 355 F.3d 233, 248-49 (3d Cir. 2004) <u>rev'd on other grounds</u>, <u>Rompilla v. Beard</u>, 545 U.S. 374 (2005); <u>see also</u> <u>Werts</u>, 228 F.3d at 202-03 (examining Pennsylvania ineffective assistance law and determining that it is identical to the <u>Strickland</u> standard).  The first prong of the Pennsylvania formulation – whether the underlying claim has arguable merit – is a factor that may be considered under <u>Strickland</u>'s first prong.  <u>Id.</u> at 248 n.9 (citing <u>Parrish v. Fulcomer</u>, 150 F.3d 326, 328 (3d Cir. 1998) (counsel not ineffective for failing to raise meritless claims); <u>see also</u> <u>Strickland</u>, 466 U.S. at 691.  Of course, the merit of the underlying claim is also a consideration in <u>Strickland</u>'s prejudice prong because, for example, a petitioner cannot show that his counsel's failure to pursue a defense or raise an objection at trial prejudiced him if that defense was not available to the petitioner or if the objection had no merit.

different result if left to our own devices." <u>Werts</u>, 228 F.3d at
197. Instead, "the state court's application of [<u>Strickland</u>] must
have been objectively unreasonable," meaning, the "outcome . . .
cannot reasonably be justified under existing Supreme Court
precedent." <u>Hackett</u>, 381 F.3d at 287.  For the reasons set forth
below, Petitioner has failed to establish that the Superior
Court's adjudication on the merits of his ineffective assistance
of counsel claims was objectively unreasonable.

**(4)  Trial Counsel's Alleged Ineffective Assistance**

**a.**

First, Petitioner faults his trial counsel, Attorney Kaiser,
for failing to contend that his conviction was invalid because
Pennsylvania law directed that his criminal proceedings commence
on the basis of a bill of information rather than via a grand
jury indictment.  He contends he was entitled to a grand jury
indictment under the Fifth Amendment to the United States
Constitution.

The Superior Court rejected this claim based upon the well-
settled principle that the Fifth Amendment right to a grand jury
does not apply to state prosecutions.  (Doc. 21, Ex. 3 at 140
(citing <u>Hurtado v. California</u>, 110 U.S. 516 (1884)).  Petitioner
insists that the right to a grand jury has been made applicable
to the states, but that simply is not the law.  <u>Hurtado</u>, 110 U.S.
at 517-38; <u>Wojtycha v. Hopkins</u>, 517 F.2d 420, 425 (3d Cir. 1975)

10

("The United States constitutional requirement of indictment by grand jury has not been made applicable to the states.") (citing Hurtado and Alexander v. Louisiana, 405 U.S. 625 (1972)).

Thus, as the Superior Court concluded, any objection to Petitioner's criminal proceedings on the grounds that he did not receive a grand jury indictment would have been found to be utterly meritless.  When a petitioner claims that his counsel failed to raise a claim that the court determines to be without merit, relief on an ineffective assistance of counsel claim is not available, and the Superior Court appropriately denied relief on this claim.  See Strickland, 466 U.S. at 691.

**b.**

Second, Petitioner faults Attorney Kaiser for stipulating to the chain of custody of the DNA evidence recovered from the vaginal swab.  At the PCRA hearing, Attorney Kaiser explained why he stipulated to the chain of custody.  He noted that he filed a pre-trial motion seeking to suppress the DNA evidence.  (Doc. 21, Ex. 3 at 51-52).  In that motion (which is located at Doc. 4, Vol. I, Part 1, at 13), the defense argued that the DNA evidence obtained from the vaginal swab should be suppressed for a number of reasons, including because the Commonwealth had not established that a proper chain of custody was followed.

The Honorable John F. Wagner, Jr., conducted a hearing on the defense's suppression motion.  In an Opinion dated May 24,

2001, denying the motion, Judge Wagner wrote that a custodial officer from the Pennsylvania State Police testified that the items in question were received at the police's evidence room on November 3, 1978, and that the items remained "in the evidence room through the present date except for a certain period of time when the items were released for laboratory analysis." (Doc. 4, Vol. I, Part 1, at 21).

After Judge Wagner denied the suppression motion, Attorney Kaiser explained he decided to stipulate at trial to the chain of custody of the DNA evidence. (Doc. 21, Ex. 3 at 51-54). He determined that challenging the Commonwealth's DNA evidence, in addition to the chain-of-custody surrounding the vaginal swab, would be pointless based upon the evidence admitted at the pre-trial hearing. (Id.) Attorney Kaiser further explained that he decided not to challenge the DNA evidence because Petitioner had admitted to a number of people that he had sexual intercourse with the victim around the time of her murder. (Id.) Based upon these two factors, he surmised that the defense's best approach would be to acknowledge that Petitioner had sexual intercourse with the victim, but argue that that fact alone did not establish that he killed her. (Id.) That approach was objectively reasonable, as was the Superior Court's decision to deny this claim.

**c.**

12

Third, Petitioner faults Attorney Kaiser for failing to obtain DNA analysis on the black hair found around the rectal area of the victim's body.  At the PCRA hearing, Petitioner claimed that "there was ten individuals, including the victim's deceased mother, who said that there was a black man that was a known pimp chasing [the victim] and there's that kinky black hair.  With my coloring, it should be right there, you know, there's no way in the world that that came off my body."  (Doc. 21, Ex. 3 at 18-19).

At the PCRA hearing, Attorney Kaiser explained why he decided not to have DNA testing conducted on the hair found on the victim.  (Doc. 21, Ex. 3 at 56-59).  He stated that the defense's strategy throughout the case was to suggest that the victim had been having relations with a number of men, and that therefore there were other individuals that might have had a motive and opportunity to kill her.  (Id.)  After discussions with Petitioner, Attorney Kaiser determined that the best strategy with regard to the hair was to point out to the jury that the prosecution did not link the hair to Petitioner, thus suggesting that it could have come from another individual. (Id.) If the defense had DNA testing conducted on the hair and it matched Petitioner, Attorney Kaiser explained, the defense would have been foreclosed from making that suggestion to the jury and any DNA match also would have bolstered the prosecution's

13

evidence against Petitioner.  (Id.)  Attorney Kaiser's conduct regarding the black hair was objectively reasonable.

Moreover, Petitioner was not prejudiced by counsel's failure to have DNA testing conducted on the hair.  As the Superior Court pointed out, even if we assume that DNA analysis would establish that the hair did not match Petitioner, he has not shown that there is a reasonable probability that the jury would have acquitted him had his counsel gathered that evidence and admitted it at trial.  The probative value of such evidence, if it indeed existed, is not as great as Petitioner would have this court believe.  Such evidence may have supported the defense's position that the victim was having relations with another man (a suggestion the defense was able to make at trial anyway), but it did not exclude Petitioner as the murderer, because the prosecution had DNA evidence from another source (the semen from the vaginal swab) that established that Petitioner had contact with the victim shortly before her death.  And, Petitioner had confessed to the crime.

In sum, as the Superior Court held, Attorney Kaiser's explanation for why he did not have DNA testing done on the hair was objectively reasonable and Petitioner was not prejudiced by counsel's actions.

**d.**

Fourth, Petitioner contends that Attorney Kaiser provided

him with ineffective assistance for failing to call Charles
Martin and Patrick Malamphy to testify for the defense.  Each
individual gave a statement to police during the murder
investigation in which he stated that he saw the victim shortly
before her death at the R Lounge with a man with dark straight
hair and facial hair.  Martin also told the police that he saw
the victim get into a burgundy/maroon colored car with the man.
(Petitioner drove a black car).  And, Malamphy was unable to
select Petitioner out of a police line-up.

Petitioner claims that if Attorney Kaiser would have called
Martin and Malamphy for the defense, each would have provided
testimony that would have "placed the victim on the night of her
murder with another man, not fitting [his] description[.]"  (Doc.
1 at 26).  Once again, Petitioner overstates the value of the
potential evidence at issue.  At the PCRA hearing, Martin and
Malamphy each testified that he simply could not say one way or
the other whether Petitioner was the individual he saw with the
victim.  (Doc. 21, Ex. 3 at 43-45, 48-49).  That is why, Attorney
Kaiser testified, he decided not to call either individual to
testify for the defense.  (Id. at 59-62).

Attorney Kaiser, who reviewed Martin's and Malamphy's
statements to police prior to making his decision not to call
them at trial, further explained that Malamphy's description of
the individual he saw with the victim actually pointed towards

15

Petitioner, because at the time of the murder Petitioner's hair was long and he had facial hair.  (Id.)  He also determined that Martin's testimony regarding the color of the car would not have been of value to the defense because:  "I didn't want to firm up the Commonwealth's testimony.  We're talking about a black car versus a maroon car, at night time with bar lights and moon light on the car." (Id. at 60).

As the Superior Court held, Attorney Kaiser's rationale for not calling Martin and Malamphy at trial was objectively reasonable.  Its decision to deny relief on this claim satisfies AEDPA's standard of review.

**e.**

Petitioner next contends that Attorney Kaiser provided him with ineffective assistance of counsel for failing to petition for the removal of Nancy Vernon, Esquire, the assistant district attorney prosecuting the case.  He claims that Vernon's father, William Duffield, Esquire, had represented him during the initial investigation of Covach's murder in the late 1970s, and that Vernon worked at her father's firm afterwards and would have had access to files pertaining to him and this case.

Petitioner's claims are belied by the testimony that Attorney Kaiser and Vernon (who is now the District Attorney of Fayette County) gave at the PCRA hearing.  Kaiser testified that, prior to the trial, he asked Vernon whether her father had

16

previously represented Petitioner in the Covach case.  (Doc. 21, Ex. 3 at 68-69).  Vernon assured Kaiser that her father did not represent Petitioner in the Covach murder investigation.  (<u>Id.</u>; <u>see also</u> <u>id.</u> at 97-99).  She stated that her father had represented Petitioner on an unrelated robbery charge and files related to that representation were the only files her father had in his office regarding Petitioner.  (<u>Id.</u>)  Vernon also testified that she did not have access to any confidential communications between her father and Petitioner regarding the Covach case, and that if she had, she would have recused herself from the case. (<u>Id.</u>)

The PCRA court credited Vernon's testimony and this court is bound by those credibility determinations.  28 U.S.C. § 2254(e)(1); <u>Weeks v. Snyder</u>, 219 F.3d 245, 259 (3d Cir. 2000) (federal habeas statute provides federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by the federal habeas courts).  Thus, as the Superior Court held, Vernon did not labor under a conflict of interest in the case and Kaiser acted reasonably in not seeking her removal as prosecutor. Petitioner's protestations to the contrary are not persuasive and do not entitle him to habeas relief under AEDPA.

**f.**

Petitioner contends that Attorney Kaiser provided him with

17

ineffective assistance for failing to investigate juror
misconduct regarding alleged communications between Juror No. 241
and a member the victim's family.

Attorney Kaiser testified at the PCRA hearing that upon
learning that the juror may have spoken to a member of the
victim's family, he immediately notified Judge Capuzzi, who then
questioned Juror No. 241.  (Doc. 21, Ex. 3 at 72).  The juror
vehemently denied that he spoke to anyone from the victim's
family, and the court accepted the denial.[6]  This court is bound
by that credibility determination.  28 U.S.C. § 2254(e)(1).

Petitioner contends that Kaiser should have asked for a
mistrial or requested that the trial court conduct a separate
hearing so that the juror and the court employee who reported
seeing the juror speak to the victim's family could be questioned

_____

[6]  The trial transcript reflect that prior to the prosecution's
presentation of its case, the court questioned Juror No. 241 as
follows:

THE COURT: Were you talking with a family member of the
victim?

JUROR NO. 241: I wasn't talking to nobody.  I was in the
hallway and not talking.

THE COURT: Do you know who the family members are?

JUROR NO. 241: No.

THE COURT: Were you talking with anybody about this case?

JUROR NO. 241: No. They got it all mixed up. I wasn't
talking with nobody.

(Doc. 21, Ex. 2 at 8).

18

under oath.  As noted above, this court is bound by the trial court's credibility determination that Juror No. 241 did not speak to any of the victim's family members.  28 U.S.C. § 2254(e)(1).  For that reason alone, Petitioner's claims fails. Attorney Kaiser also articulated a reasonably strategic explanation at the PCRA hearing for his conduct related to this matter.  He explained that he did not proceed further on the matter because the trial court had interviewed Juror No. 241 and accepted Juror No. 241's denial.

### g.

In his final claim of ineffective assistance of trial counsel, Petitioner alleges that Attorney Kaiser provided him with deficient performance when he failed to object to the prosecution's introduction of alleged inadmissible testimony. During her direct testimony, Mary Matlock testified that Petitioner hit her and threatened her.  (Doc. 21, Ex. 2 at 43). Attorney Kaiser immediately objected on relevance grounds and Judge Capuzzi sustained.  (Id.)  The prosecution, however, continued to question Matlock in a manner that revealed Petitioner's past violence towards her.  (Id. at 43-46).  At another point in her testimony, Matlock testified that Petitioner destroyed his car because he could not make the payments on it. (Id. at 42).  Petitioner claims the jury would have inferred from that testimony that he committed insurance fraud.

19

Petitioner contends that Attorney Kaiser should have objected that the above-cited "prior bad acts" testimony was not admissible pursuant to Rule 404(b) of the Pennsylvania Rules of Evidence.  The Superior Court refused to consider this claim on the merits.  It determined that Petitioner waived the claim because he had not properly presented it in his PCRA petition or at the PCRA hearing.  (Doc. 21, Ex. 3 at 137).

Because the Superior Court rejected this claim based on Petitioner's failure to comply with a state procedural rule, the claim is procedurally defaulted and not subject to federal habeas corpus review.[7]

Nevertheless, even if this claim were not procedurally barred, Petitioner would not be entitled to habeas relief.  He has failed to demonstrate that he was prejudiced by Attorney Kaiser's alleged deficient performance.  Considering the strength

---

[7]  The "procedural default" doctrine dictates that federal courts will not review a federal claim for habeas relief if the state court that previously reviewed the claim rejected it because the petitioner failed to comply with a state procedural rule that is "independent" of the federal claim and "adequate" to support the judgment.  See e.g., Coleman v. Thompson, 501 U.S. 722, 750 (1991); Whitney v. Horn, 280 F.3d 240, 249-53 (3d Cir. 2002).  In this case, the decision by the Superior Court to deny Petitioner relief on this claim is "independent" of federal law because it applied a purely state-law rule in evaluating the claim.  The Superior Court's decision is also "adequate," since Pennsylvania appellate courts consistently and regularly dismiss review of claims in non-capital cases that are improperly raised at the PCRA-court level.  See e.g. Commonwealth v. Wallace, 724 A.2d 916, 921 n.5 (1999) (issues not raised in PCRA petition and presented to PCRA court are not eligible for appellate review.)

of the Commonwealth's case against him – including evidence that he confessed to the murder – he has not shown that there is a reasonable probability that the jury would have acquitted him of first-degree murder had Attorney Kaiser prevented Matlock from testifying about Petitioner's "prior bad acts."

### 5.   Ineffective Assistance of Appellate Counsel

Petitioner contends that Attorney Zerega provided him with constitutionally ineffective assistance because she failed to raise on direct appeal two claims of prosecutorial misconduct.[8]

### a.

First, Petitioner contends that Attorney Zerega provided him with constitutionally deficient performance for failing to argue on direct appeal that the prosecution knowingly admitted false evidence at trial.[9]   Specifically, he argues that Clarence LaRue

_____

[8]  Petitioner also presents these two claims, as well as the ineffective assistance of trial counsel claim discussed immediately above at section II.B(4)g, as due process violations based upon prosecutorial misconduct.  The Superior Court held that the prosecutorial misconduct claims were not cognizable under the PCRA statute because Petitioner could have, but did not, raise the claims on direct appeal.  (Doc. 21, Ex. 3 at 130). Based upon the Superior Court's decision, Petitioner's prosecutorial misconduct claims are barred from federal habeas review under the doctrine of procedural default, and this court will review the claims, as the Superior Court did, as claims of ineffective assistance of counsel.

[9]  A conviction obtained through the use of knowingly false evidence cannot stand under the due process clause of the Fourteenth Amendment.  See e.g., Miller v. Pate, 386 U.S. 1, 7 (1967); Napue v. Illinois, 360 U.S. 264, 269 (1959).  To succeed on such a due process claim a petitioner must prove three things: 1) that the evidence at issue was, in fact, false; 2) that the government used this evidence, knowing it was false; and 3) that the evidence at issue was material to the petitioner's guilt or innocence at trial.  Troedel v.

lied when he testified that Petitioner confessed to him and that the prosecution knew LaRue's testimony was false.

In support of the underlying prosecutorial misconduct claim, Petitioner directs the court to a police report authored by Trooper Joseph A. Schweikert that is dated February 27, 1980. (Doc. 1, Ex. J).  In that report, Trooper Schweikert recounts that in February 1980, he administered a polygraph examination to LaRue as part of an investigation into the criminal homicide of Brenda Lee Ritter.  Trooper Schweikert explained that no direct questions concerning the Covach murder investigation were asked during the examination.  However, Trooper Schweikert did note that, during the examination, he asked LaRue:

> "Did you deliberately lie to investigators concerning what [Petitioner] told you?"  Subject answered no. This question would relate to the COVACH case since he is also furnishing information to investigators about what [Petitioner] told him about the COVACH homicide.

(Id.)  At the conclusion of his report, Trooper Schweikert observed: "Evaluation of the polygrams on the *overall examination*, in this examiner[']s opinion, revealed that this subject produced polygraph charts that are indicative of attempting deception."  (Id. (emphasis added)).

At the PCRA hearing, Attorney Zerega provided an objectively reasonable explanation as to why she did not contend on direct

---

Wainwright, 667 F.Supp. 1456, 1458 (S.D.Fla. 1986), aff'd, Troedel v. Dugger, 828 F.2d 620 (11th Cir. 1987).

appeal that the prosecution knowingly admitted LaRue's purported false testimony.  She stated, correctly, that Trooper Schweikert's report did not demonstrate that LaRue specifically lied to investigator's regarding Petitioner's alleged confession to him.  (Doc. 21, Ex. 3 at 89-94).  Rather, Trooper Schweikert concluded that LaRue was attempting to be deceptive during the course of his interview regarding the Ritter homicide investigation.  In Attorney Zerega's opinion, Trooper Schweikert's report simply did not provide the defense with a meritorious claim that the prosecution knowingly introduced false evidence at Petitioner's trial.  (Id.)  At most, the report revealed what the defense had already attempted to establish through cross-examination at trial: that LaRue was a criminal whose testimony could not be credited.

In sum, Petitioner has failed to demonstrate that Attorney Zerega provided him with ineffective assistance for failing to raise the prosecutorial misconduct claim at issue on direct appeal.  As the Superior Court concluded, "merely because LaRue may have been deceptive in his answers to an unrelated polygraph examination does not, *ipso facto*, make his testimony perjurious.  [Petitioner] presented no other evidence that would indicate that LaRue's testimony was perjurious or that the Commonwealth knew of the alleged perjury."  (Doc. 21, Ex. 3 at 139).

**b.**

23

In his final claim, Petitioner argues that Attorney Zerega provided him with ineffective assistance of counsel for failing to raise on direct appeal a claim that the prosecution violated its purported obligation under Brady v. Maryland, 373 U.S. 83 (1963) to conduct DNA testing on the black hair found on the victim.  The Superior Court's rejection of this claim satisfies AEDPA's standard of review.

Under Brady, the government has a due process obligation to disclose to the defense evidence in its possession that is material to either guilt or punishment.  373 U.S. at 87.  There is no due process requirement, however, that the government use any particular investigatory tool, including quantitative testing, to secure exculpatory evidence.  Arizona v. Youngblood, 488 U.S. 51, 58-59 (1988).  The fact that Petitioner couches the prosecution's failure to perform DNA testing in terms of Brady does not convert a legitimate prosecutorial choice into a constitutional violation.

Moreover, the absence of a Brady violation is particularly clear where, as here, the evidence was equally available to the defense, which chose not to pursue this course of investigation. See, e.g., Wright v. Hopper, 169 F.3d 695, 702 (11th Cir. 1999) (holding that government did not suppress evidence when defendant knew about the existence of the evidence and could obtain it through the exercise of reasonable diligence).  The defense had

knowledge of the black hair recovered from the victim and, as discussed above, Attorney Kaiser strategically opted not to pursue DNA testing on the hair.

### 6.   Certificate of Appealability

Section 102 of AEDPA, 28 U.S.C. § 2253(c), codifies standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition.  It provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  In the case at bar, Petitioner has not made any showing that he has been denied any of his constitutional rights.  Accordingly, a certificate of appealability should be denied.

III. <u>CONCLUSION</u>

For the foregoing reasons, it is respectfully recommended that the Petition for Writ of Habeas Corpus be denied and that a certificate of appealability be denied.  In accordance with the Magistrates Act, 28 U.S.C.  § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, the parties are allowed ten (10) days from the date of service to file objections to this report and recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of

objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,

/s/ Amy Reynolds Hay
United States Magistrate Judge

Dated: 29 November, 2006

cc:  Hon. Thomas M. Hardiman
     United States District Judge

     James F. Sullivan
     BT-9865
     SCI Dallas
     1000 Folies Road
     Dallas, PA 18612-0286

     Nancy D. Vernon
     District Attorney of Fayette County
     61 East Main Street
     Fayette County Courthouse
     Uniontown, PA 15401